IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

CORA SALAMANCA,                                    Civil No. 03-1773-AA
                                                   OPINION AND ORDER

                 Plaintiff,

        vs.

PROVIDENCE HEALTH SYSTEM-
OREGON dba PROVIDENCE ST.
VINCENT MEDICAL CENTER,

                 Defendant.

────────────────────────────────────

D. Michael Dale
Law Offices of D. Michael Dale
P.O. Box 1032
Cornelius, Oregon  97113
        Attorney for plaintiff

Peter Richter
Tamera Russell
Miller Nash
3400 U.S. Bancorp Tower
111 S.W. Fifth Avenue
Portland, Oregon 97204-3699
        Attorneys for defendant

AIKEN, Judge:

Defendant filed a motion for summary judgment against plaintiff's claims for relief. Defendant's motion is granted as to plaintiff's age discrimination claim, but is denied for all other claims.

<u>BACKGROUND</u>

Salamanca, a Filipino woman, was hired by defendant Providence St. Vincent Medical Center ("Providence") in 1997 as a registered nurse. Shortly after, Providence promoted Salamanca to the position of relief charge nurse in the coronary care unit ("CCU"). Two years later, she became the relief charge nurse in the cardiac recovery unit ("CRU").

In 2001, Lynne Perkins became the nurse manager overseeing the CRU, the CCU, and the intensive care unit. As the nurse manager, Perkins was Salamanca's supervisor.

In the fall of 2001, Providence had two open positions for charge nurses on the night shift. Salamanca did not express interest in either position at that time. According to Providence, Perkins encouraged Salamanca to apply for the charge nurse position, but Salamanca said that she was not interested because she was near the end of her career. Two other nurses state that Salamanca indicated to them that she was not interested in the position. (Doc. 48, Dec. of Luz Sacdal at 2; doc. 49, Dec. of Amber Ralston at 2). Salamanca does not address

this allegation, but states that she met with Perkins to apply for the position on March 18, 2002.

Neither of the charge nurse positions were filled until September 2002. Until the positions were filled, Salamanca and a couple of other nurses filled the positions on a temporary basis as relief charge nurses.

When the two charge nurse positions became available in the fall of 2001, two nurses expressed interest. One of them, Fred Calixtro, was Filipino, and the other, Vicki Marshall, was Caucasian. In January 2002, Perkins offered Calixtro and Marshall an opportunity to attend a seminar for charge nurses provided by Providence. According to Perkins, Calixtro and Marshall were the only two nurses whom she sent to the seminar because they were the only two nurses who had expressed interest in the charge nurse position.

In March 2002, Salamanca met with Perkins to apply for the charge nurse position. According to Salamanca, Perkins asked her to submit her resume, which she did the following day.

In April 2002, Perkins met separately with Calixtro and Salamanca to discuss their interest in the charge nurse position. Salamanca's complaint focuses on what was said by Perkins in their April 22, 2002 meeting. Salamanca alleges that Perkins's intent was to discourage Salamanca from applying for the charge nurse position. During the meeting, Perkins told Salamanca that

a number of nurses had expressed concern about the possibility of Salamanca becoming a charge nurse. Further, Perkins told Salamanca that if she were given the position, it may cause "polarity" among the nurses. Salamanca described the conversation as follows:

> She told me that she's going to change the two charge nurse positions into just one charge nurse position, because she's concerned about polarity, and I never heard the word "polarity" in my life. So I asked her what does she mean by that. At first she kind of beat around the bush and can't explain it, but finally she told me polarity is that - a group of people might oppose the second position and that if I go for this position - for the charge nurse position - she tries to discourage me by saying, "If you go for this, the staff will not support [you.]"

(Doc. 61, ex. IID at 10 (depo. pg. 34)).

Salamanca believed that when Perkins used the term polarity, she meant a divide of the staff along racial lines. According to Salamanca, Perkins made it clear that she would not support Salamanca in the charge nurse position and wanted Salamanca to withdraw her application. Further, Salamanca alleges that Perkins falsely told Salamanca that she was going to fill only one charge nurse position, instead of two. It was Salamanca's understanding that Perkins would not fill the remaining charge nurse position with Salamanca. As a result, Salamanca withdrew her application.

Perkins admits that she used the word polarity; however, she alleges that she was not referring to Salamanca's race. Instead,

Perkins alleges that she intended to inform Salamanca that nurses had expressed concern about Salamanca's ability to fulfill the charge nurse position. Perkins alleges that several nurses indicated to her that Salamanca did not communicate effectively and had poor problem-solving skills. Perkins's allegation is supported by declarations from several Filipino and Caucasian nurses who indicated that they had expressed concern about Salamanca's ability to fulfill a leadership role. (Doc. 47, Dec. of Sophie Cipriana Kesinger at 2; doc. 49, Dec. of Amber Ralston at 2; doc. 50, Dec. of Emily Goerke at 3; doc. 48, Dec. of Luz Sacdal at 2). Some of the nurses worried that Salamanca was not interested in being a charge nurse, but had applied for the position because she disliked Vicki Marshall and did not want Marshall to get the position. (Doc. 48, Dec. of Luz Sacdal at 2; Doc. 50, Dec. of Emily Goerke at 2).

Perkins alleges that she wanted Salamanca to understand that she was not supported by some of the nurses and that if Salamanca became the charge nurse without the support of some of the nurses, it would be difficult to be a successful charge nurse. According to Perkins, she wanted Salamanca to work on gaining support from the staff nurses and then reapply for the position. (Doc. 53, ex. 2, deposition (depo.) of Lynne Perkins at 13).

Salamanca became very upset during the meeting. Perkins stated that Salamanca "was having difficulty understanding – she

kept focusing and centering around the staff not supporting her. There were staff who supported her, there were staff not supporting her. And I tried numerous times to explain." Id.

During the April meeting, Salamanca told Perkins to let Calixtro have the position. Salamanca alleges, however, that she withdrew her application because Perkins falsely told her that only one charge nurse position would be filled and she believed that Perkins would not fill two charge nurse positions with Filipinos.

Providence alleges that Salamanca would have been hired at that time had she not withdrawn her application because the collective bargaining agreement with Oregon Nurses Association requires that the nurse with the most seniority must be hired if that nurse has the skills, abilities, and qualifications. Providence states that Salamanca had the skills, abilities, and qualifications for the position.

After the meeting with Perkins, Salamanca contacted Perkins's manager, Kathy Johnson, and expressed her concerns about Perkins's use of the word polarity. On or about May 7, 2002, Johnson met with Perkins and Salamanca to discuss Salamanca's concerns. Johnson then set up a meeting for the next week with herself, Perkins, Salamanca, and Calixtro. At that meeting, Perkins apologized for having offended Salamanca and attempted to explain her use of the word "polarity". Perkins

told Salamanca that "[i]t was not a cultural or ethnic connotation, but that there was support and lack of support on the unit." Id. at 15.

According to Calixtro's BOLI witness statement, he was not satisfied with Perkins's explanation of use of the word polarity, and as a result, he withdrew his application for the charge nurse position. (Doc. 61, ex. IA1, BOLI Witness Statement of Fred Calixtro). However, in Calixtro's Declaration, he states that he believed Perkins when she stated that she had not used the word polarity to refer to a racial divide of the staff. (Doc. 45.) In September, Calixtro officially reapplied for the charge nurse position and Perkins hired him to fill the first charge nurse position.

On June 19, 2002, Salamanca reapplied for the charge nurse position using an on-line application process. Salamanca, however, withdrew her application the next day. Salamanca alleges that she withdrew her application because she was told by another nurse that Perkins would not hire her. Providence alleges that Perkins would have been hired at that time if she had kept her application active because there were not any other applicants at that time.

In early August 2002, Salamanca resigned from the relief charge nurse position that she had been filling on a temporary basis. Salamanca resigned because she could not communicate well

with Perkins.

In August 2002, Elissa Walsh, a Caucasian nurse, applied for
the charge nurse position. Salamanca alleges that Perkins
immediately sent out an enthusiastic email announcing Walsh's
application, although Perkins had never publicly acknowledged
Salamanca or Calixtro's applications. According to Walsh,
Perkins's email made her uncomfortable because it stated, "We
finally have an applicant," and did not mention that Calixtro was
an applicant at that time. (Doc. 61, ex. IF, Dec. of Elissa
Walsh at 3). Walsh later withdrew her application when Salamanca
decided to reapply because Walsh was not dedicated to the
position and felt that Salamanca was well-qualified. Id. at 2-3.

On August 28, 2002, Perkins presented Salamanca with her
annual evaluation. In the section of the evaluation titled
"Professional Registered Nurse Evaluation," Salamanca received
"needs improvement" ratings for two of the six evaluation areas.
Salamanca disagreed with the evaluation and the manner in which
Perkins gave her the evaluation. Salamanca described the
interaction as follows:

> [S]he just kept talking in negatives. Everything
> is negative. And she just talking to me in an
> intimidating way . . . .
> I've never been humiliated in my life, in my
> entire life.

(Doc 53, ex. 1, depo. of Cora Salamanca at 20).

According to Perkins, she gave Salamanca two "needs

improvement" ratings for several reasons.

> For example, it was my understanding that several of
> the employees plaintiff supervised believed that
> plaintiff did not demonstrate compassion or respect
> towards them. I also believed that plaintiff's
> communication style needed to improve . . . . I had
> received complaints from employees in the CRU about how
> plaintiff had not welcomed or supported a new employee
> on the team, who ultimately left the unit. Other
> complaints regarding plaintiff were that she openly
> discussed issues with staff that reflected private
> conversations related to the charge nurse position and
> that she quit her relief charge nurse position without
> notice. Employees also told me that plaintiff engaged
> in conversations with employees about other employees
> that were seen as negative and unsupportive.

(Doc. 44, Dec. of Lynne Perkins at 2-3).

In 2002, Perkins conducted 29 evaluations of registered nurses and gave "needs improvement" ratings to six nurses. The other five nurses who received "needs improvement" ratings were Caucasian.

Following the evaluation, Salamanca alleges that she had severe emotional distress and experienced high blood pressure, a headache, palpitations, and an upset stomach. Salamanca took a medical leave of absence from August 29, 2002 until October 18, 2002.

On September 5, 2002, Salamanca asked the human resources department to process her previous application for the charge nurse position. On October 11, 2002, Salamanca filed a complaint with the Oregon Bureau of Labor and Industries. Salamanca was interviewed for the charge nurse position in early October, and

received the position on or around November 6, 2002.

Salamanca is still employed by Providence in the charge nurse position and does not allege that she has been discriminated against since she received that charge nurse position.

STANDARDS

Summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c). Substantive law on an issue determines the materiality of a fact. T.W. Elec. Serv., Inc. v. Pac. Elec. Contractors Assoc., 809 F.2d 626, 630 (9th Cir. 1987). Whether the evidence is such that a reasonable jury could return a verdict for the nonmoving party determines the authenticity of a dispute. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986).

The moving party has the burden of establishing the absence of a genuine issue of material fact. Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986). If the moving party shows the absence of a genuine issue of material fact, the nonmoving party must go beyond the pleadings and identify facts which show a genuine issue for trial. Id. at 324.

Special rules of construction apply when evaluating summary

judgment motions: (1) all reasonable doubts as to the existence of genuine issues of material fact should be resolved against the moving party; and (2) all inferences to be drawn from the underlying facts must be viewed in the light most favorable to the nonmoving party.  T.W. Elec., 809 F.2d at 630.

In an employment discrimination case, "if a rational trier of fact could, on all the evidence, find that the employer's action was taken for impermissibly discriminatory reasons," summary judgment for the moving party is inappropriate.  Wallis v. J.R. Simplot, 26 F.3d 885, 889 (9th Cir. 1994).

DISCUSSION

Plaintiff alleges the following claims: race and age discrimination and retaliation under Title VII of the Civil Rights Act of 1964, 42 U.S.C. §§ 2000e et seq. and Or. Rev. Stat. 659A.

### 1. Plaintiff's Race Discrimination Claims

Title VII of the Civil Rights Act of 1964 makes it unlawful for an employer "to discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race."  42 U.S.C. § 2000e-2(a)(1). An employer commits an unlawful employment practice when a protected characteristic is a "motivating factor" in the employer's decision, even if other factors also motivated the

practice. § 2000e-2(m).

Similarly, it is illegal under Oregon law "[f]or an
employer, because of an individuals's race, religion, color, sex,
national origin, marital status or age . . . to discriminate
against such individual in compensation or in terms, conditions
or privileges of employment." Or. Rev. Stat. § 659A.030.
Section 659A.030 was modeled after Title VII. Garcez v.
Freightliner Corp., 188 Or. App. 397, 400, 72 P.3d 78 (2003).
Therefore, the standard used under Oregon law to establish a
prima facie case of discrimination is identical to the federal
standard. Snead v. Metro. Prop. & Cas. Ins. Co., 237 F.3d 1080,
1087 (9th Cir. 2001); Henderson v. Jantzen, 79 Or. App. 654, 657;
719 P.2d 1322 (1986) (reversed on other grounds).

In an employment discrimination case, the Supreme Court
directs that a plaintiff must first establish a prima facie case
in response to a summary judgment motion. McDonnell Douglas
Corp. v. Green, 411 U.S. 792, 802 (1973). To establish a prima
facie case, plaintiff "need only offer evidence that gives rise
to an inference of unlawful discrimination." Wallis v. J.R.
Simplot Co., 26 F.3d 885, 889 (9th Cir. 1994)(internal quotes
omitted). The degree of proof required to establish a prima
facie case "on summary judgment is minimal and does not need to
rise to the level of a preponderance of the evidence." Id.
After a plaintiff has established a prima facie case, the burden

then shifts to the employer to articulate a legitimate,
nondiscriminatory reason for its action.  Id.  The burden then
shifts back to the plaintiff to show that the employer's reason
was a pretext for discrimination.  Id. at 890.[1]

A plaintiff may show pretext two ways: "(1) indirectly, by
showing that the employer's proffered explanation is 'unworthy of
credence' because it is internally inconsistent or otherwise not
believable; or (2) directly, by showing that unlawful
discrimination more likely motivated the employer."  Chuang v.
Univ. of Calif. Davis, Bd. of Trustees, 225 F.3d 1115, 1127 (9th
Cir. 2000).  These two approaches are not exclusive; a
combination of the two kinds of evidence may serve to establish
pretext so as to make summary judgment improper.  Id.  A
plaintiff need not introduce additional, independent evidence of
discrimination at the pretext stage.  Id.  "A disparate treatment
plaintiff can survive summary judgment without producing any
evidence of discrimination beyond that constituting her prima
facie case, if that evidence raises a genuine issue of material
fact regarding the truth of the employer's asserted reasons.  Id.
(citing Reeves v. Sanderson Plumbing Prods., Inc., 530 U.S. 133,

_____

[1] Although Oregon courts have rejected the *McDonnell Douglas*
burden-shifting approach, *Callan v. Confederation of Oregon
School Adm'rs.*, 79 Or. App. 73, 77, 717 P.2d 1252 (1986), the
Ninth Circuit has held that the burden-shifting approach applies
to claims brought under § 659A in federal court.  *Snead*, 237 F.3d
at 1093.

143 (2000)). Therefore, "it is permissible for the trier of fact to infer the ultimate fact of discrimination from the falsity of the employer's explanation." Reeves, 530 U.S. at 143. Other factors to consider in determining pretext include what information is known to the defendant at the time of the adverse employment decision, the plausibility of the explanations offered in light of the evidence, and any inconsistencies within the explanations offered. Norris v. City and County of San Francisco, 900 F.2d 1326, 1331 (9th Cir. 1990).

To establish a prima facie case of race discrimination, plaintiff must produce evidence that: (1) she belongs to a protected class; (2) she applied for and was qualified for a position for which her employer was seeking applicants; (3) she was rejected for the position despite her qualifications; and (4) after she was rejected, the position remained open and her employer continued to seek applicants from persons with her qualifications. McDonnell Douglas, 411 U.S. at 802. Providence does not dispute that Salamanca is a member of a protected class or that she was qualified for the charge nurse position. Providence, however, argues that Salamanca does not meet the third or fourth elements of the McDonnell Douglas test.

According to Providence, Salamanca does not satisfy the third element because she was never denied a promotion. Further, Providence argues that Salamanca would have received the charge

nurse position if she had not withdrawn her application.

Salamanca, however, disagrees with the assertion that she was never denied a promotion. Although Salamanca was never officially denied a promotion, she argues that she was in effect denied the charge nurse position in March 2002. Salamanca alleges that she applied for one of two open charge nurse positions, that Perkins removed the second position so that she would not have to hire Salamanca, and that Salamanca withdrew her application for the charge nurse position because she had been told that she would not be hired. Further, Salamanca contends that the fact that Salamanca was offered the position in November 2002 does not excuse the rejection that she was given in March 2002. See Furnco Const. Corp. v. Waters, 438 U.S. 567 (1978).

Salamanca's case is analogous to Nanty v. Barrows Co., 660 F.2d 1327, 1331-32 (9th Cir. 1981), which held that a plaintiff who did not apply for a position because he was told that no positions were open met his prima facie burden. The plaintiff in Nanty attempted to apply for an open position, but was told that the position was filled despite that fact that the position was still open and was not filled until a few days later. Id. at 1332. Admittedly, Salamanca's case is weaker that the Nanty plaintiff because at least one charge nurse position remained open. Salamanca, however, alleges that she was falsely told by Perkins that there was only one charge nurse position available

and she was led to believe that she would not be given that position. Based on the evidence in this case, a jury could find that Salamanca was in effect denied a promotion.

The fourth element of the prima facie test requires that a plaintiff demonstrate that after she was rejected for a position, the position remained open and her employer continued to seek applicants with similar qualifications to those of the plaintiff. Two charge nurse positions remained open until the first one was filled by Calixtro in September of 2002. The second charge nurse position was open until Salamanca received the position in November 2002. Salamanca alleges that Perkins sent out a very enthusiastic email after Elissa Walsh applied for the charge nurse position, although no email had ever been sent announcing Salamanca or Calixtro's application. Additionally, there is no evidence that any of the Caucasian nurses were ever discouraged from applying for the position, while Salamanca alleges that she was encouraged to withdraw her application.

Although this is a close case, sufficient evidence exists for a jury to find that Salamanca was denied a promotion and that after she was denied the position, the position remained open and applicants with similar qualifications were sought. Thus, I find that the evidence in this case gives rise to an unlawful inference of discrimination.

The burden then shifts to defendant to articulate a

legitimate, non-discriminatory reason for the delay in hiring plaintiff. Providence, however, has failed to come forward with evidence that it had a legitimate, non-discriminatory reason for not promoting Salamanca. Without such evidence, this court must deny summary judgment on plaintiff's race discrimination claim under Oregon and federal law.

### 2. Plaintiff's Age-Discrimination Claim

The Age Discrimination in Employment Act (ADEA), 29 U.S.C. § 621 et. seq., provides that it is an unlawful employment practice to fail to hire an individual or "discriminate against any individual with respect to [her] compensation, terms, conditions, or privileges of employment, because of such individual's age." 29 U.S.C. § 623. The ADEA was modeled after Title VII. Smith v. City of Jackson, Miss., 125 S. Ct. 1536, 1540 (2005). Therefore, an age-discrimination claim based on circumstantial evidence is analyzed in the same way as a race-discrimination claim. Enlow v. Salem-Keizer Yellow Cab Co., Inc., 371 F.3d 645, 650 (9th Cir. 2004) ("The McDonnell Douglas formula applies under the ADEA where an employee must rely on circumstantial evidence that he or she was at least forty years old, met the requisite qualifications for the job, and was discharged while younger employees were retained."); see also Reeves, 530 U.S. at 142.

Salamanca alleges that she was denied the promotion to the

charge nurse position because of her age. Salamanca, who is 57
years old, belongs to a protected class under the ADEA. 29
U.S.C. § 631(a) (providing that persons over 40 years of age are
protected by the ADEA). Providence argues that summary judgment
should be granted on the age-discrimination claim because
Salamanca has failed to provide any evidence that she was
discriminated against as a result of her age.

Salamanca bases her claim solely on the fact that she is 57
years old, and therefore, older than the other nurses who applied
for the charge nurse position. Salamanca does not provide any
evidence that Perkins discriminated against her because of her
age. Although Salamanca provided three declarations from nurses
who stated that the hiring process seemed unusual and Salamanca
may have been discriminated against, all three of the nurse
declarants believed that the potential discrimination was based
on plaintiff's race, not her age. (*See* doc. 61, ex. IB, Dec. of
Emily Goerke at 3; doc. 61, ex. IC, Dec. of Marsha Rice at 3;
doc. 61, ex. IE, Dec. of Myrna Serrano at 3).

I find that Salamanca has failed establish a prima facie
case of age discrimination. Accordingly, summary judgment is
granted for the defendant with respect to Salamanca's age
discrimination claim under the ADEA.

### 3. Plaintiff's Retaliation Claim

A plaintiff may establish a prima facie case of retaliation

by showing that: (1) she engaged in protected activity; (2) she suffered an adverse employment action; and (3) there was a causal link between her protected activity and the employer's action. Villiarimo v. Aloha Island Air, Inc., 281 F.3d 1054, 1064 (9th Cir. 2002).

Salamanca alleges that her protected activity was complaining to Providence's human resource department about Perkins's allegedly discriminatory use of the term "polarity." It is undisputed that this was a protected activity. Providence, however, argues that Salamanca did not suffer an adverse employment action. Further, Providence argues that there is no causal link between Salamanca's complaint to the human resource department and Salamanca's evaluation.

According to Providence, the two "needs improvement" ratings that Salamanca received on her August 2002 evaluation do not constitute an "adverse employment action". An adverse employment action is one that is "reasonably likely to deter employees from engaging in protected activity." Ray v. Henderson, 217 F.3d 1234, 1237 (9th Cir. 2000). This test focuses on the deterrent effect of the employment action, not on the ultimate effect on the plaintiff's employment. Id. at 1243.

In Yartzoff v. Thomas, 809 F.2d 1371, 1376 (9th Cir. 1987), the court stated that "[t]ransfers of job duties and undeserved performance ratings, if proven, would constitute "adverse

employment decisions" cognizable under this section." The court later clarified that the Yartzoff holding is limited to "sub-average" evaluations, and does not apply to mediocre evaluations that do not give rise to any further negative employment action. Lyons v. England, 307 F.3d 1092, 1118 (9th Cir. 2002) (citing Kortan v. California Youth Authority, 217 F.3d 1104 (9th Cir. 2000)).

Providence relies on Kortan for its argument that Salamanca did not suffer an adverse employment action. In Kortan, the court held that the plaintiff did not establish a prima facie case of retaliation. Kortan, 217 F.3d at 1113. However, Kortan is clearly distinguishable from Salamanca's case. Although the plaintiff in Kortan initially received three lower than average ratings from one of her supervisors, a supervisor with more authority determined that the ratings were retaliatory and immediately changed the lower than average ratings to "performance fully meets expected standards." Id. at 1112. The holding in Kortan is based on the fact that the higher supervisor changed the plaintiff's low evaluation ratings and the plaintiff suffered no harm as a result of the initial sub-average ratings. Id. at 1113. Thus, Kortan is not controlling in this case.

Additionally, Providence argues that Salamanca cannot establish a prima facie claim of retaliation because she has failed to show that her low ratings were caused by her complaint

to Johnson in May 2002. Causation sufficient to establish a prima facie case "may be inferred from circumstantial evidence, such as the employer's knowledge that the plaintiff engaged in protected activities and the proximity in time between the protected action and the allegedly retaliatory discharge." Yartzoff, 809 F.2d at 1376. The Ninth Circuit has held that sufficient evidence to infer retaliatory conduct existed where a plaintiff suffered adverse employment actions within three months of his protected activities. Yartzoff, 809 F.2d at 1376. In contrast, the Ninth Circuit refused to infer that an employment action was retaliatory when it occurred 18 months after the protected activity. Villiarimo, 281 F.3d at 1065.

In this case, Salamanca received her evaluation three months after she complained about Perkins to Perkins's supervisor. The close proximity in time is sufficient to allow an inference that Salamanca's poor performance ratings were retaliatory. Further, the inference of retaliation is supported by Salamanca's allegation that in her 33 years as a nurse, she had never received a sub-average evaluation. (Doc. 61, ex. IID, depo. of Salamanca at 24 (depo. pages 92-93)). Thus, a disputed issue of material fact exists regarding whether she was given a poor evaluation as a result of her complaint to Perkins's supervisor. Accordingly, I find that Salamanca has established a prima facie case of retaliation.

Once a plaintiff has established a prima facie case, the burden of production shifts to the defendant to demonstrate a legitimate, non-discriminatory reason for its action. <u>Yartzoff</u>, 809 F.2d at 1376. The ultimate burden of persuasion remains, however, with the plaintiff. Thus, an employer need not prove that it was motivated by the proffered reasons. Rather, "[i]t is sufficient if the defendant's evidence raises a genuine issue of fact as to whether it discriminated against the plaintiff." <u>Tex. Dep't of Cmty. Affairs v. Burdine</u>, 450 U.S. 248, 254-55 (1981).

According to Providence, Perkins gave Salamanca the two "needs improvement" ratings for support of the mission and service excellence/teamwork because Perkins had received complaints from several nurses about Salamanca's communication skills. Providence has provided declarations from four nurses stating that they were concerned with Salamanca's communication and leadership skills. (Doc. 47, Dec. of Kesinger at 2-3; doc. 48, Dec. of Luz Sacdal at 2-3; doc. 49, Dec. of Amber Ralston at 2; doc. 50, Dec. of Emily Goerke at 3). Thus, I find that Providence has sustained its burden of demonstrating a legitimate, non-discriminatory purpose for Salamanca's negative ratings.

Once a defendant has demonstrated a legitimate, non-discriminatory reason for the employment action, the plaintiff must be given an opportunity to demonstrate that the proffered

reason was merely pretext for impermissible retaliation.

Burdine, 450 U.S. at 256. A plaintiff may demonstrate pretext "either directly by persuading the court that a discriminatory reason more likely motivated the employer or indirectly by showing that the employer's proffered explanation is unworthy of credence." Burdine, 450 U.S. at 256. A plaintiff relying on indirect, circumstantial evidence must provide "'specific' and 'substantial" evidence of pretext in order to survive summary judgment. Stegall v. Citizen Broadcasting Co., 350 F.3d 1061, 1066 (9th Cir. 2003). The Ninth Circuit has observed, however, "that a grant of summary judgment . . . is generally unsuitable in Title VII cases in which plaintiff has established a prima facie case because of the 'elusive factual question' of intentional discrimination." Yartzoff, 809 F.2d at 1377. Without an inquiry into the employer's motives, it would be easy for an employer to "mask their behavior using a complex web of post hoc rationalizations." Stegall, 350 F.3d at 1072-73 (citation omitted).

Salamanca alleges that Providence's proffered reasons for her negative evaluation were merely pretext. Salamanca argues that the complaints Salamanca's co-workers made to Perkins were fabricated. Perkins was unable to provide any documentation of the complaints which she alleges she received from Salamanca's co-workers prior to the August 2002 evaluation. (Doc. 61, ex.

IIB, depo. of Doug Patnode at 12-14 (depo. pgs. 47:24-48:16, 51:14-22), ex. 21). Although Providence has submitted declarations from nurses stating that they had concerns about Salamanca's communication skills, (doc. 47, Dec. of Kesinger at 2-3; doc. 48, Dec. of Luz Sacdal at 2-3; doc. 49, Dec. of Amber Ralston at 2; doc. 50, Dec. of Emily Goerke at 3), those nurses did not state in their declarations that they had expressed their concerns to Perkins. Accordingly, Salamanca should be given the opportunity to cross-examine Perkins and the nurses to determine whether they made complaints to Perkins and whether those complaints were the motivation for Salamanca's poor evaluation. See Yarztoff, 809 F.2d at 1377.

## CONCLUSION

Noting that the degree of proof required to survive summary judgment under Title VII is minimal, defendant's motion for summary judgment (doc. 41) is granted in part and denied in part as follows: defendant's motion is denied as to plaintiff's race discrimination and retaliation claims; defendant's motion is granted as to plaintiff's age discrimination claim. Further, defendant's motion to strike (doc. 68) is denied. The parties' request for oral argument is denied as unnecessary.

The court notes that this is a very close case with plaintiff's two remaining claims barely surviving summary judgment. Given the costs of litigation, the parties are

encouraged to notify to court if they are interested in pursuing settlement negotiations.

IT IS SO ORDERED.

Dated this 28 day of November 2005.

_____
Ann Aiken
United States District Judge